The third case is Neste Oil. Counselor, are you ready to proceed? Yes, Your Honor. Mike Flippert? Mike Flippert, you're reserving three minutes. Yes, Your Honor. Thank you. Mike Flippert for the appellant, Neste Oil. The Board in this case committed legal error by failing to analyze Claim 22 as a whole, including the requirement for a biological feedstock having more than 5 weight percent free fatty acids. The Board's analysis of H2O temperature never addressed the same requirement for feedstocks having more than 5 weight percent free fatty acids. We point the court to pages 13-16 of the analysis of the opinion, which is at page 39-42. But the issue wasn't whether it would have been obvious to select the H2O temperature in the range that's claimed in the abstract, but whether it would have been obvious to do so in the context of this overall process with a biological feed having more than 5 weight percent free fatty acids. But the Board never addressed the correct issue. And so we submit this as harmful error because the evidence shows that higher... You don't have the burden of establishing that it's non-obvious. That's correct, Your Honor. Where did you develop your argument below that Claim 22 was non-obvious as a whole? Well, we argued that in the briefs. We also submitted expert testimony from Dr. Klein, who is a leading expert in the field. He's an academic at the University of Delaware. And so we had two expert declarations. We also have the prior arc, which we submitted, including the Craig reference, the Monier reference. And Craig was particularly important on this issue because Craig specifically teaches that H2O temperature is feedstock dependent. Give me a record site where, because the PTAB says NESS did not address why the claim limitations present in the original claims, either in isolation or as combined and substitute, Claim 21 would render the claim non-obvious. Yes, Your Honor. Give me a site. And I think what they're talking about there are the other dependent features that were added to the claim. So when they talk about that, they're not talking about the issue we're raising here. But in terms of the issue of the claim as a whole, I mean, we argued it in the reply brief and the motion to amend it, A3357. It was in Dr. Klein's declaration. Both of his declarations, A2172 and A2210, were some of the key places. But yeah, you're correct that the board, they did note that we hadn't made sort of separate arguments for these dependent features that were also folded in. There were a number of amendments that were made. But we're focusing here on the temperature limitation, which was, we thought, a key feature. But you are correct, as to the other features, the board said we hadn't made, essentially, separate arguments for those. But this was harmful error, we believe, because Craig teaches that, first of all, that HGO temperature is feedstock dependent. And secondly, for tall oil fatty acid, which is a feedstock of the type claimed, which has a high free fatty acid content, that a higher temperature was required. And so, essentially, the art was teaching those two critical things. And REG never disputed this, that there was a dependency of the type of feedstock, because these are very complicated mixtures of triglycerides having different chain lengths, different amounts of free fatty acids, and the like. And so, because you have this very broad range of starting materials, you have a very broad range of temperatures. And the art appreciated that, and Craig specifically taught that for these types of feeds, as claimed, having free fatty acids, one needs to use a higher temperature. So, for example, in that Craig reference, the optimum temperature for tall oil fatty acid is 390. And Craig specifically says that was somewhat higher than processing of other materials. Also, the Monier reference, which the board did not address… Tall oil fatty acid has very, very much more than 5% weight fatty acid. That's correct. So, even though it had a temperature above the range claimed here in the reference, there's a fair amount to go down for fatty acids or for feedstock that are, say, at 6%. Yes, that's an excellent question, and the answer to that is look at Monier. Monier, which the board never addressed, has a variety of feedstocks having free fatty acids at much lower levels, and yet still has higher temperatures that are proposed. So, you are absolutely correct that Craig is a very high content of free fatty acids, but the Monier reference, which was six years later, still has very high free fatty acid content. I mean, it still has very high temperatures, but at lower contents of free fatty acids. I believe we have a table in our brief that has the different amounts of free fatty acids for Monier. But again, R&D never disputed this feedstock dependency issue. They put in no contrary evidence on this, and that's why we submit this was a harmful error. We cited the Wilson and Villa-Chevalier cases, the CCPA decisions, where the CCPA had analogous situations where the board had essentially disregarded a particular claim limitation in doing the obviousness analysis. In both those cases, the CCPA reversed, because this derives directly from Graham. This is the basic principle from Graham. One has to compare the claim as a whole with all of its limitations to the prior art. And in those two cases, the board didn't do that. It disregarded the limitation, and the board was reversed. Again, here, the board never addressed feedstock dependency of H2O temperature, and disregarded the limitation regarding the specific type of feedstock when it considered the H2O temperature issue. And we submit that that was reversible legal error, as in Wilson and as in Villa-Chevalier. Now, we also note that REG presented no substantive response to those two CCPA cases that we cited, and so they don't dispute the legal principle, which of course derives directly from Graham, that one has to consider all the limitations when comparing the prior art to the claim dimension. So we submit that this is the first error, this failure to follow Graham, failure to consider all of the claim limitations when considering that H2O temperature issue, and in particular, the fact that the prior art would have led to higher temperatures if one had considered that type of feedstock was being processed. I mean, essentially, the board assumed that all the feedstocks that were available could be processed at all the temperatures, and that was contrary to the accepted understanding of the art. So, I'd also like to address the teaching away issue, if I could. Now, we submit that there can be no prima facie case here because the board did not conduct a proper Graham analysis. So we don't think the court actually has to necessarily get to the teaching away issue. I mean, there was no proper Graham analysis. There can be no prima facie case. But even if there was a prima facie case, we submit that we rebutted that with evidence of teaching away. The key here was, again, the Craig reference, which RIG's expert described as the gold standard in the art. The Craig reference has a very clear disclosure of an example with tall oil fatty acids, which is a feedstock of the type claimed, which has, again, as we said, high free fatty acid content. If you look at columns 9 through 10 of Craig, which is in A2861, you'll see that Craig reported that at temperatures of 350 degrees and lower, the product collection system was plugged with a solid margarine-like material. And we submitted expert testimony from Dr. Klein, which was not rebutted, indicating that one of ordinary skill would have interpreted that disclosure to mean that HDO of this type of feedstock would not work at temperatures below 350. Does Craig specifically connect the problem of clogging to the high molecular weight hydrocarbons as opposed to something else? I'm not sure I understand or remember the details well enough. Somebody refers to heavies, which might not be exactly the same thing. To the extent you understand what I just said, can you clarify? That's an excellent question. He does not. Craig does not. And the problem is clearly tied to temperature. Craig recognized the problem was temperature-dependent, but there was never any understanding of why this was happening. And this is exactly what's missing from the board's analysis and missing from Dr. Chabud's testimony, because although Dr. Chabud said one could change the reactor configuration, change the catalyst, one could change U-solution, all these chemical engineering principles he mentioned, and you could have reduced high molecular weight hydrocarbons, he never tied that to the reactor plugging. He provided no opinion that reducing high molecular weight hydrocarbons would in fact solve the plugging problem. And the board cites no evidence, there is no evidence in the record, explaining or even theorizing that that would have solved the inoperability of what Craig teaches. So it isn't known why the plugging occurred, but Craig teaches it's temperature-dependent. Is that way of looking at it perhaps relevantly burden-flipping? That is, if Craig doesn't quite teach a way with respect to the hydrocarbons, then there's not really a teaching of that sort to overcome to explain. Well, Craig had experimental data. The reason that REG's experts said it's the gold standard is that it's a detailed series of experiments intended to determine what the optimum temperatures are for these varying feedstocks. And Craig clearly reports that temperatures below 350 did not work, particularly for these types of feedstocks. That's what one of the board members would take from this reference. There is inoperability at temperatures below 350. And again, inoperability is a touchstone of teaching away. Now, the board in its opinion refers to essentially three things to try to overcome this problem. They credit Dr. Chigurh's testimony. We accept that they credited his testimony. But what did he say? What he said was, first, that Jakula's different reactor configurations and catalysts could lead to different optimal temperatures. And secondly, he said that reduced temperature and dilution would lead to lower levels of high molecular weight hydrocarbons. And then third, he said that increased catalyst activity could lead to lower H2O temperatures. He never even postulated or theorized any link between those effects and having no plugging. So there is no evidence saying, for example, that if one reduces the high molecular weight hydrocarbon content, one can use a lower temperature. Why was he offering those observations? I'm sorry? Why was he offering those observations unless they were connected to the… Well, he was offering general chemical engineering principles, but Dr. Klein… Was there a general lecture about what was going on? I'm sorry. His was just sort of a general lecture. He was general. It was very general. And in fact, the board's opinion is very general. It's stating general chemical engineering principles that we don't dispute. But we had a clear teaching away in a reference, and we put in expert testimony from a leading expert saying that one of ordinary skill would have interpreted that to mean that it did not work. Well, what about… I think this was Dr. Chigurh or maybe it was the board, but Chigurh, that said Craig used a small reactor, commercial-scale reactor. Everything drops by 30 degrees, and if you drop by 30 degrees, you're down into at least the upper part of the claimed range. Well, if you're talking about that Table 8, even if you subtract 30 degrees from the tall oil fatty acid entry, which is the only one that falls within the claim, it's still above our claimed range. And also… That testimony wanted to subtract it from the 350. Well, I don't think the reference would suggest to do that. Not for these claimed feedstocks. Again, they're ignoring the feedstocks that are being claimed. We have to look… Again, the issue wasn't whether it would be obvious to do it for some other feedstock, like a purified vegetable oil. Would it have been obvious for these feedstocks, such as tall oil fatty acid? And also… But that's where maybe it makes a difference that tall oil field fatty acid is… I think it was 70, 90%? It's very high. It's even higher than that. Very high. That's correct. And so, in terms of differences between Craig and Shukula, yes, there may have been some differences, but they never tied any of those differences to a resolution of the plugging problem that Dr. Klein identified and said one of ordinary skills would have… You're an awesome idea, Robo. I appreciate it. Yes, Ron, I'll save the rest of my time if I could. Thank you. May it please the Court, Your Honor? John Gills on behalf of RHE. We disagree with counsel's statement that the board committed legal error. They followed appropriate law. And, in fact, the issue here, as Your Honor has correctly stated,  and on patentability. And they did not meet that burden here. The judge has correctly cited to the portion of the final written decision where the board starts out by saying Nesty never made an argument that Claim 22 as a whole is not obvious over the art. That's on pages 11 and 12 of that final decision, or A37-38. Nesty itself, both in its motion to amend and its reply brief on its motion to amend, and even at oral argument, focused on the two limitations, the temperature limitation and the high molecular weight hydrocarbon limitation. And that's, in turn, what the board focused on. Nesty did not make an argument that the claim as a whole was not obvious. They say they did in their reply brief. Counsel cited to page A3357 in their reply brief, and we disagree that this supports an argument that the claim as a whole is not obvious. If you look at that page, again, it's talking about the very two limitations that the board focused on, namely the temperature limitation and the high molecular weight limitation. And the board, in considering both the references themselves, the declarations submitted by both experts, and the deposition testimony, found that these limitations did not render Claim 22 not obvious. I want to talk about the feedstock dependency argument that counsel raised. First, I think it's undisputed in the record that most of the limitations in Claim 22 are disclosed in the Jocula reference, the A3245 reference. The narrow purity limitations, which were in original Claim 3 that was canceled, the 5 weight percent free fatty acid, which was in original Claim 4 that was canceled, the diluting agent in original Claim 7 that was canceled, and even the dilution ratio of original Claim 5. But what Jocula also discloses, which is undisputed, is multiple feedstocks. Jocula discloses TOFA, or tall oil free fatty acids. It discloses coconut oil and talc. And the record sites for that are also discussed in Dr. Chigrou's declaration, A2715 to 2716, and in the reference A3245, A3249. So not only does it entirely encompass the claim range of 280 to 330, that was the new limitation, where Jocula discloses 200 to 500 degrees Celsius, and a preferred range of 300 to 400. For the feedstock that has the other properties at issue? Jocula discloses a process very similar to what is claimed in the 094 patent. All of the various... For feedstock that has greater than 5% fatty acids? Yes, Your Honor. The feedstock limitation of Claim 22 was just copied from Original Claim 4, which was previously found to be anticipated by Jocula. So there's no dispute that Jocula discloses processing of biological feedstocks with 5 weight percent free fatty acids. But Jocula also gives a range of feedstocks. It doesn't just mention TOFA, one of them. It gives feedstocks over the breadth of that 5 weight percent on up to 100%. TOFA is 100%. With different temperatures? With a wide temperature range, right? Jocula discloses a broad temperature range of 200 to 500. And if one recognized that the temperature might be a function of the particulars of the feedstock, there's no particular reason to infer that the lower end of the temperature range disclosed is being taught by Jocula for the higher range of the feedstock in terms of fatty acids. What Jocula gives you, I think, is a roadmap. And Jocula talks about temperature being a result-effective variable. Particularly when Jocula talks about you can lower temperatures based on the feedstock you use. There's actually a site in Jocula that says you can use a variety of feedstocks and still have a desirable outcome. And it talks about a pre-hydrogenation step because there was a recognition already in the ARC that depending on the feedstock you use, it could lead to the formation of high molecular weight hydrocarbons or heavies. So Jocula explained, given the recognition in the ARC that use of certain feedstocks could lead to the formation of heavies, you can do an optional pre-hydrogenation step and operate the process at milder conditions such as lower temperatures. So what we submit is that a person of skill in the ARC having Jocula in hand, disclosing a wide range of feedstocks that could be used over a temperature range that encompasses the claim range, including when they say it's preferably 300 to 400, and where they say, depending upon what feedstock you use and the propensity of heavies being formed, you can lower the temperatures, a person of skill in the ARC would have known what to do. We cite cases in our briefs like on-ray applied materials, where you've got a result-effective variable like temperature, where a person of skill in the ARC is presumed to know how to optimize to get at the claimed features. But I also want to talk about what the board focused on was the span of time. The Craig reference that they cite to was filed in 1988. It issued in 1991. The Jocula reference was filed in 2003 and was published in 2004. The Monier reference that they refer to was filed in 1995 and issued in 1998. Over that span of time, which the board recognizes, lots of things happen. Jocula cites to Monier, which cites to Craig. A person of skill in the ARC would have all of this prior ARC in front of him or her and would be able to put this together. And when the board talks about why there's no teaching away by Craig or why a person of skill would have been able to optimize, the board specifically says, we think Dr. Chigrou's testimony more persuasively considers the expressed teachings of Craig, of Jocula, the timing of the disclosures, the differences in the reactor conditions, configuration and operating conditions, and the knowledge, skill, and reasoning of a person of skill in the ARC. And I want to talk a little bit about those operating conditions. Craig and Monier were processes that did not use dilution, which is something that Jocula recognized. Dilution is going to help you operate at a lower temperature. Dilution is also going to impact the formation of high molecular weight hydrocarbons or heavy. So, again, giving the person of skill in the ARC information about how to manipulate temperature in order to achieve the desired result. Also, I'm sorry, Your Honor. Mr. Flivert says that he recognizes what Dr. Chigrou said, but on the teaching away issue, Mr. Flivert argues that the board made a mistake here in relying on Dr. Chigrou because Chigrou never connected up the dots, if you will. That Chigrou is talking about a number of concepts in chemical engineering, but he isn't explaining how they work to explain the plugging problem. What's your response to Mr. Flivert's argument? I disagree that Dr. Chigrou doesn't connect the dots. He explains extensively the teachings of Jocula in his first and second declarations, which are in the record, where he mentions things like use of dilution to control temperature rise and formation of heavies, for example, at A4035-46. Why is he mentioning that at 4035-46? What problem is he addressing? He's addressing the concept that it was well appreciated in the ARC that dilution could control both the temperature at which you operated the HVO process as well as limit the formation of high molecular weight hydrocarbons. So where you have a claim 22 that has a temperature range that they're saying distinguishes it from the ARC, and where it has a claim limitation of less than 1 weight percent high molecular weight hydrocarbons, dilution was something that was recognized in the ARC to affect both of those things, and Dr. Chigrou talks about that. And that's important in the context of Craig, because Craig didn't use dilution. So in 1991 or 1988, when he filed his work, there was no dilution. As Mr. Flippert... What you're saying is the clogging problem mentioned in Craig is nonexistent, doesn't exist anymore.  Craig was teaching away from a problem that the industry solved after Craig. I don't know that it was a problem. I think Mr. Flippert acknowledged... Assume, for purposes of argument, that clogging was a problem that you'd like to avoid. If it was a problem that people wanted to avoid, it had been solved some 15 years later by the time we got to Jocula. Because Jocula, in its disclosure... It's an interesting situation. Is it possible that you can have a reference that actually does teach away as of the time that that reference existed? But by the time you're considering the patent in suit, the problem has gone away. That, in theory, could happen, but I don't even think... Isn't that, in essence, what you're saying about the teach-away issue here? No. I'm saying two things, Your Honor. I think I'm saying Craig does not teach away because Craig was using a different process. Craig did not use dilution. Craig used a feedstock at the upper end of the range. Again, Nesty is trying to get a claim that covers from 5-way percent to 100%. If Craig had a problem, if clogging was a problem for Craig, it was because of what he was doing. But what you're talking about is you don't have the problem. Right. As Mr. Flippert acknowledged, the plugging was not tied to the formation of heavy. There's certainly nothing in Craig that ties those two concepts together. But even as to his mention of Craig operating at 350 degrees, Craig used a different type reactor than Jocula used. He used a benchtop reactor. Jocula is processing these feedstocks using a commercial reactor. And even Craig says in a footnote, if you use a commercial reactor, you can operate at 20 or 30 degrees less. I believe it was 30. So you go from 350 to 320. And again, Craig doesn't use dilution. If we talk about Monier, Monier, again, much earlier in time than Jocula, Monier's process did not use dilution. And like Craig, Monier also used a benchtop reactor, not a commercial reactor. These are all things that a person of skill would recognize as impacting the process. And they would certainly look to Jocula more recent in time as to what to do. I also want to note, which the board acknowledged, was the difference in catalyst. Catalyst activity, the higher catalyst activity you have, the lower temperature you can operate. And if you look at Craig, Craig has data on other feedstocks that he processed. So non-5 weight percent high feedstocks, pure oils that Craig talked about. And with those pure oils, Craig talks about, and I can provide a site for that, where when he did an experiment on canola oil, some of the experiments produced a high amount of heavies, some produced a low amount of heavies. And then when he did experiments on other pure oils, again, he observed heavies, but there was a difference in catalyst. In certain experiments, he used the nickel moly catalyst, known to give you higher catalyst activity, where you can operate at a lower temperature. Whereas when he used a cobalt moly catalyst, that was known in the art to provide lower catalyst activity. And something that Chagrou talked about in his declaration, at, for example, A2696 to A2697, and also A2687, in which I think the board, when looking at all of this together, acknowledged is what catalyst you use impacts the process. A nickel moly catalyst is better than a cobalt moly catalyst. And over the span of 15 or so years, catalyst improved. So again, when the board says, we're not just looking at the references, Craig, Monye, the other references in the record, we're looking at what Chagrou has to say about them, and we're looking at the passage of time, and again, applying the law in this area, which is where you've got a result effective variable like temperature, where you've got a reference like Jocula that puts all the pieces together. So even if they had argued, which we say they did not, that the claim as a whole is not obvious, Jocula puts it all together, and any tiny bit that's missing a person of skill in the art would have known what to do, because the roadmap is there. In my minute... 15 seconds. 15 seconds. Unless Your Honor has any questions, I think that covers my argument. Thank you. Thank you, Your Honor. Thank you, Your Honor. First, I don't think we've heard really any significant dispute that the Board did not consider all the claim limitations, including the 5% free fatty acid limitation, when it assessed the issue of HCO temperature. And you heard no contrary evidence cited in terms of this issue of feedstock dependency. So we think the first point is essentially undisputed. Also, they did not even attempt to distinguish the Wilson case or De La Chevrolet, which we cited in our brief, which we think are controlling, on the question of what's required underground when considering the claim dimension versus the prior art. So I think... that point, I think, is established. On the Jocula reference, the Board said that it was crediting... it said in particular, in light of Jocula's successful results, that the only results in Jocula on HCO are in the single example, which does not disclose the HCO temperature. And so, what could one of skill take from that? It doesn't disclose the temperature. Now, Jocula does have a preferred range of 300 to 400, right? That is entirely consistent with Craig. Craig taught that for tall oil fatty acid, the optimal temperature is 390. That's within that preferred range of Jocula. There is no evidence to suggest that Jocula did anything other than follow Craig and use 390. There's no reason to believe that Jocula used a lower temperature. So when the Board said it was relying upon Jocula's successful results, first of all, that doesn't really make sense because there's no temperature disclosed in the results. But secondly, the results were for tall oil fatty acid, in that example, and Craig taught to use 390, which is within the preferred range of Jocula. So we don't think it's possible to draw anything from that combination, logically. Thank you, counsel. Thank you, Your Honor. That concludes the oral arguments for today. Let me just say, this Court expects a very high level of skill on the part of appellate advocates, and both counsel, I think, met that level. I was very pleased with this argument. Thank you. Thank you, Your Honor.